*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

# MEMORANDUM OPINION

No. 04-08-00287-CR

Veronica **HERRERA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2007CR10131
Honorable Bert Richardson, Judge Presiding

Opinion by:     Marialyn Barnard, Justice

Sitting:     Rebecca Simmons, Justice
            Steven C. Hilbig, Justice
            Marialyn Barnard, Justice

Delivered and Filed:  June 10, 2009

AFFIRMED

Veronica Herrera was convicted by a jury of murdering her boyfriend's three-year-old son.

Herrera presents three issues on appeal asserting the trial court erred by: (1) denying her pre-trial

motion to suppress because her statement to the police was involuntary; (2) denying her motion to

suppress when she re-urged it during trial on the basis that her statement was a product of custodial

interrogation obtained without the safeguards provided by article 38.22 of the Texas Code of Criminal Procedure and *Miranda v. Arizona*;[1] and (3) denying her motion for a mistrial based on a substitution of the trial judge presiding over her trial. We affirm the trial court's judgment.

### VOLUNTARINESS OF STATEMENT

In her first issue, Herrera contends the trial court erred in denying her motion to suppress the videotaped statement she gave to police because it was involuntary.

When a defendant moves to suppress a statement on the ground of "involuntariness," the due process guarantee requires the trial court to hold a hearing on the admissibility of the statement outside the presence of the jury. *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). At the hearing, the trial court is the sole judge of the weight and credibility of the evidence, and the trial court's finding may not be disturbed on appeal absent a clear abuse of discretion. *Id.*; *Martinez v. State*, 131 S.W.3d 22, 35 (Tex. App.—San Antonio 2003, no pet.). The prosecution bears the burden of proof at the hearing on admissibility and must prove by a preponderance of the evidence that the defendant's statement was given voluntarily. *Alvarado*, 912 S.W.2d at 211; *Martinez*, 131 S.W.3d at 35.

The voluntariness of a statement is determined by examining the totality of the circumstances. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). The ultimate question is whether the defendant's will was "overborne" by police coercion. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997); *Weaver v. State*, 265 S.W.3d 523, 534 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). In answering this question, we may consider various relevant factors, including the length of detention, incommunicado or prolonged detention, denying a family access

---

[1] 384 U.S. 436 (1966).

to a defendant, refusing a defendant's request to telephone a lawyer or family, and physical brutality. *Nenno v. State*, 970 S.W.2d 549, 557 (Tex. Crim. App. 1998), *overruled on other grounds*, *State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999); *Licon v. State*, 99 S.W.3d 918, 924 (Tex. App.—El Paso 2003, no pet.). An accused's mentality is also a factor to be considered but is not conclusive of involuntariness. *Delao*, 235 S.W.3d at 239-40.

Detective Curtis Walker and Detective Raymond Roberts went to the hospital to investigate a suspicious death of a three-year-old child. Prior to speaking with Herrera, the detectives knew that the EMS technicians disbelieved that the child had drowned. They also knew that the redness or burn on the child's face was not present when his father, who was Herrera's boyfriend, left for work the morning the child drowned. Detective Roberts described the child as having second-degree burns covering the side of his face, around his forehead, and down around his mouth and ears. A doctor informed Detective Roberts that the burn could not have been caused by a recent sunburn because the skin would have needed time to blister and come off.

When Detective Walker approached Herrera, Herrera first told the detectives that the child hit his head at the pool and drowned, and the redness was a sunburn from the previous day. Herrera then told the detectives that she left the child on the stairs of the pool to see how much a soda would cost and found him under the water when she returned to the pool. Herrera also told the detectives that the child kept looking up at the sun and was scraping his face against the cement at the pool, causing the redness.

Detective Walker asked Herrera if she would accompany them to the station to talk about what happened while it was still fresh on her mind. Detective Walker explained that they were talking to everybody that knew anything. Initially, Herrera asked if she could go to the station the

following day. Although Detective Walker told her the following day would be fine, Detective Roberts suggested it might be more fresh on her mind if she went that day. In response to the suggestion, Herrera agreed to go.

Herrera was transported to the station in an unmarked administrative car. Detective Walker drove, Herrera rode in the front passenger seat, and Detective Roberts rode in the back. Nothing was said about the case on the way to the station. In response to whether she was taking any medications, Herrera informed the detectives that she was taking Depakote and Strattera. Detective Walker stated that if Herrera had refused to accompany the officers to the station, she would have been free to leave, and she would have been recontacted the following day.

Upon arriving at the station, Herrera was taken to an interview room, and Detective Roberts started the recording equipment. After Herrera completed a form with her identifying information, Detective Walker began taking her statement. Detective Walker testified that he told Herrera three times during the course of taking the statement that she was not required to talk to him. Both detectives stated that they did not corece, force, or threaten Herrera and did not promise her anything. Herrera was not handcuffed. During the interview, she was given water to drink. The door to the room where Herrera was being questioned was closed but not locked. Detective Walker testified that Herrera understood the questions being asked and promptly answered them. The interview lasted just over two hours. Neither detective believed Herrera had a mental deficiency.

During the interview, Detective Walker admitted raising his voice when Herrera told him that the redness to the child's face could have been caused when the child was playing by himself in the bathtub under hot water. Detective Walker testified that Herrera's explanation frustrated him

because Herrera was stating that the child had caused the redness himself. Herrera later told the detectives that she had held the baby under the hot water.

Also during the interview, Herrera asked for her "mommy" on one occasion, and Detective Walker responded that the child wanted his mommy too. Detective Herrera understood the request to be a childlike response and not an actual request by Herrera to see her mother.

After the interview was finished, Herrera was allowed to speak with her mother in the interrogation room. She then left with her mother. Detective Walker obtained a warrant for Herrera's arrest later that night.

Wallace Ross, a certified psychologist, testified that he examines and makes determinations regarding individual's mental retardation on a regular basis. Mr. Ross explained the tests and criteria used in making such a determination. Pursuant to a court order, Mr. Ross examined Herrera and determined that she is in the mild range of mental retardation and functions on the level of an eight-year-old. Mr. Ross also reviewed Herrera's videotaped statement. Mr. Ross testified that Herrera had the capacity to make the statement at the police department; however, she did not have the mental capacity to stop giving the statement during the interview. Mr. Ross stated that Herrera did not have the capacity to determine that she could or should leave the interview room. Mr. Ross testified that whether the statement was voluntary, however, was beyond the scope of his expertise.

On cross-examination, Mr. Ross admitted that he observed a small degree of malingering by Herrera during the testing. Mr. Ross acknowledged that he had reviewed a report prepared by Dr. Tennison, who had tested Herrera for competency to stand trial. He acknowledged Dr. Tennison's concerns with regard to Herrera's malingering given that she claimed that she could not read or write despite her videotaped statement which showed her ability to complete the identification information

requested on the form she was presented and a letter she had written to her boyfriend. Mr. Ross acknowledged that Herrera was a certified nurse's assistant and had been employed at a retirement community in that capacity.

Dr. Joann Murphey, a clinical psychologist, also examined Herrera and concluded that she suffers from mild mental retardation with an IQ of 63. Dr. Murphey testified that Herrera had the mental capacity to agree to give a statement to the police but did not have the mental capacity to stop giving the statement and was highly susceptible to suggestion during the questioning. Dr. Murphey stated that the detectives were using words during the questioning that Herrera did not understand. Dr. Murphey opined that Herrera did not voluntarily give her statement. Dr. Murphey also opined that Herrera was competent to stand trial.

On cross-examination, Dr. Murphey stated that she had not reviewed Dr. Tennison's report but "certainly" had concerns about malingering by Herrera because there is a natural tendency when a person is being tested in connection with a criminal matter to downplay their abilities. Dr. Murphey referred to testing on collateral sources in which other people are questioned regarding Herrera's abilities; however, she admitted that the other people questioned were Herrera's friends and family.

In this case, the detention lasted approximately two hours. The first hour was a fairly non-confrontational discussion of the events of the day in chronological order. The second hour was more confrontational when the detectives began to challenge Herrera on her original version of the events and her failure to explain the burns on the victim's face. Herrera was reminded on several occasions that she was voluntarily present. Although Detective Walker did not respond to Herrera's statement that she wanted her "mommy," he did not consider the statement to be a request to speak

to her mother. Morever, although Herrera was mildly mentally retarded and Dr. Murphey opined that the statement was not voluntary, concerns were raised with regard to Herrera's malingering during the testing. The ultimate question for the trial court was whether Herrera's will was "overborne" by police coercion. *Creager*, 952 S.W.2d at 856; *Weaver*, 265 S.W.3d at 534. Having reviewed the videotaped statement and considering the totality of the circumstances, we hold that the trial court did not abuse its discretion in finding Herrera's statement was voluntary.

## CUSTODIAL INTERROGATION

In her second issue, Herrera asserts that the trial court erred in denying her motion to suppress her statement after she re-urged it during trial on the basis that she was not given the warnings required by *Miranda* and article 38.22 before her statement was taken.

The warnings required by *Miranda* were established to safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). The warnings required by article 38.22 are virtually identical to the *Miranda* warnings and are required to be given only when there is custodial interrogation. *Id*. at 526.

"Custodial interrogation" is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id*. at 525. A "reasonable person" standard is applied in determining whether a person is in custody. *Id*. A person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Id*. A "custody" inquiry includes an examination of all of the objective circumstances surrounding the questioning. *Id*.

In *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996), the Texas Court of Criminal Appeals outlined four general situations that might constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *See also Espinoza v. State*, 185 S.W.3d 1, 3 (Tex. App.—San Antonio 2005, no pet.). Some of the factors to be considered in determining whether a person is in custody include: (1) whether the suspect arrived at the place of interrogation voluntarily, (2) the length of the interrogation, (3) whether the suspect's requests to see relatives and friends are refused, (4) the degree of control exercised over the suspect, and (5) whether a "pivotal admission established custody." *Espinoza*, 185 S.W.3d at 3.

At trial, the defendant bears the initial burden of proving that a statement was the product of "custodial interrogation." *Id*. at 326. We afford almost total deference to a trial court's "custody" determination when the questions of historical fact turn on credibility and demeanor. *Id*. at 327. Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial court's "custody" determination de novo. *Id*.

In her brief, Herrera focuses on the testimony of an officer who questioned Herrera at the hospital prior to the arrival of the detectives and the testimony of Willard Fox, the victim's grandfather, in arguing that the trial court erred in denying her re-urged motion to suppress. Upon arriving at the hospital and requesting to see his grandson, Fox was told that his grandson was in one room, his son was in another room, and Herrera was in a third room. Fox was instructed to have a

seat in the waiting room. Although Fox's testimony is some indication that Herrera was being kept separate from the others, Fox did not testify that he requested to see Herrera, and there is no evidence in the record that Herrera made any request to see Fox.

Officer James Foster testified that he read Herrera her rights before speaking with her. In his report, Officer Foster stated that he read the rights to Herrera slowly. Officer Foster testified that he always read the rights slowly but admitted that he did not always record that description in his report. Officer Foster stated that he could not tell that Herrera was slow when speaking with her. Officer Foster stated that Herrera was not under arrest, but he read her the rights as a precaution. Officer Foster spoke with Herrera for two or three minutes. Officer Foster testified that he believed Herrera was being detained and was not free to leave.

With regard to Officer Foster's testimony that Herrera was being detained, we note that an investigatory detention is not a custodial arrest. *State v. Sheppard*, 271 S.W.3d 281, 289 (Tex. Crim. App. 2008). Moreover, Officer Foster's subjective belief is not relevant because there is no evidence that his belief was somehow communicated or otherwise manifested to Herrera. *Dowthitt*, 931 S.W.2d at 254. Furthermore, the detectives' subsequent request that Herrera voluntarily accompany them to the police station supports the trial court's ruling. Given that Herrera requested that she be permitted to go to the station the following day and was told by Detective Walker that she could, the trial court did not abuse its discretion in concluding that Herrera was not in custody when she accompanied the detectives to the station.

### SUBSTITUTION OF TRIAL JUDGE

In her final issue, Herrera contends that the trial court erred in overruling her motion for mistrial when a second trial judge substituted for the first trial judge during the trial. The second trial judge was substituted after the mother of the first trial judge was hospitalized.

"Mistrial is a remedy appropriate for a narrow class of highly prejudicial and incurable errors." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). A trial court's denial of a motion for mistrial is reviewed for abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

Herrera's attorney moved for a mistrial alluding to the pretrial hearings on the voluntariness of Herrera's confession and the second trial judge's reliance on representations made by the first trial judge. In response to the second trial judge's response that the first trial judge already ruled on that issue, Herrera's attorney never further explained how the substitution of the second trial judge prejudiced Herrera with regard to that issue. In her brief, Herrera asserts, "Appellant will never know if the second judge would have ruled differently."

When Herrera moved for a mistrial, the issue before the trial court was whether the substitution of the second trial judge was prejudicial to Herrera's case since the first trial judge had already ruled and resolved the suppression issue. Speculating with regard to whether the second trial judge might have ruled differently on the suppression issue does not explain how the substitution falls within the "narrow class of highly prejudicial and incurable errors" given that the suppression issue had been fully heard and resolved by the first trial judge. *Wood*, 18 S.W.3d at 648. Herrera "does not assert why or how the change in the trial judge denied [Herrera her] constitutionally guaranteed rights to a fair trial and due process." *Jimenez v. State*, 838 S.W.2d 661, 666 (Tex.

App.—Houston [1st Dist.] 1992, no pet.). Moreover, Herrera "has not shown [s]he was harmed by the substitution in a meaningful way." *Id.* Accordingly, we cannot conclude that the trial court abused its discretion in denying the motion for mistrial.

## CONCLUSION

The trial court's judgment is affirmed.

Marialyn Barnard, Justice

DO NOT PUBLISH